**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 21-20110-CR-MGC**

**UNITED STATES OF AMERICA**

**vs.**

**BLANCA NELIDA GONZALEZ,** *et al.,*

       **Defendants.**
_____/

**THE UNITED STATES OF AMERICA'S TRIAL BRIEF AND NOTICE OF INTENT TO
USE INEXTRICABILY INTERTWINED AND/OR 404(b) EVIDENCE AND
MEMORANDUM IN SUPPORT**

       The United States of America, through the undersigned Assistant United States Attorneys, hereby submit this trial brief to inform the Court of the anticipated evidence at trial. That evidence includes evidence that is inextricably intertwined with, and which provides necessary background and context for, the charged conduct. This evidence may also potentially be admitted pursuant to Federal Rule of Evidence 404(b). In an abundance of caution, the United States respectfully submits this notice and memorandum in support to the Court and counsel.

    **A. PROCEDURAL HISTORY**

       On or about February 25, 2021, a federal grand jury in the Southern District of Florida returned a 25-count indictment charging Edeini Lemus Borges, Jesus Ysidro Hernandez, Blanca Nelida Gonzalez, Deyanira Leon, Elier Padron Hernandez, Fernando Chacon, Gloria Yanette Jimenez, Jay Joseph, Lidia Rodriguez Oviedo, Ricardo Cardenas Arango, Sergio Jose Oduardo, Christian Ramirez, Osneldy Reyes Gonzalez, and Marcos Orozco with conspiracy to commit health care fraud and wire fraud (Count 1) and health care fraud (Counts 2–25). *See* ECF No. 3. Defendants Edeini Lemus Borges, Jesus Ysidro Hernandez, Elier Padron Hernandez, Fernando Chacon, Lidia Rodriguez Oviedo, Ricardo Cardenas Arango, Sergio Jose Oduardo, Christian

Ramirez, and Marcos Orozco pled guilty, and Defendants Gloria Yanette Jimeenz and Osneldy Reyes Gonzalez have noticed their intent to plead guilty.  Defendants Blanca Nelida Gonzalez ("Dr. Gonzalez"), Deyanira Leon ("Leon"), and Jay Joseph ("Joseph") ("the remaining Defendants") plan to proceed to trial, which is currently scheduled for April 11, 2022.

### B. FACTUAL BACKGROUND

The government expects the trial evidence to show that the remaining Defendants participated in a scheme to pay health insurance beneficiaries to provide their health insurance information to United Medical of South Florida, d/b/a Sleep Study of South Florida ("Sleep Study" or the "clinic") so that Sleep Study could fraudulently bill the insurance companies for millions of dollars of physical therapy services, sleep studies, and allergy tests and treatments that were never provided or were otherwise medically unnecessary. Each of the remaining Defendants played a unique—and crucial—role in the scheme.

The evidence at trial will show that Defendants Edeini Lemus Borges ("Borges") and Jesus Ysidro Hernandez ("Hernandez") opened Sleep Study in 2013 with the intent to bill private insurance and Medicare for sleep studies.  Although the clinic began with the intent to provide legitimate services, Sleep Study quickly began fraudulently billing for services that patients did not receive or were not medically necessary. The fraudulent billing focused on three main areas: (1) allergy testing and treatment; (2) physical therapy services; and (3) sleep studies.  Borges prepared the billing and claims and submitted these to Blue Cross Blue Shield, United, Aetna, and Cigna (the "Insurance Company Victims") through a billing company.

Crucial to the scheme was the creation of fraudulent patient charts that contained evaluations for patients who were never evaluated, orders for treatments that were not medically necessary, and analyses of treatments that were never conducted (or were not conducted

properly)—all of which were signed off on by Defendant Blanca Gonzalez ("Dr. Gonzalez").  The evidence at trial will show that Dr. Gonzalez came to the clinic once a week—every Tuesday— sat with Borges, signed patient file after patient file, and left.  On some occasions Dr. Gonzalez would meet with a beneficiary, but primarily Dr. Gonzalez would sign files, forms, orders, prescriptions, and treatment analyses for beneficiaries she never met, much less treated.

Along with Borges and others, Leon, a massage therapist, participated in the creation of these fraudulent patient files by fabricating patient records by copying legitimate test results from other patients or information from the Internet, as well as backdating, among other methods.

Leon, along with Joseph, worked as patient recruiters whereby they would pay beneficiaries of the Insurance Company Victims to go to Sleep Study once or a few times and essentially sell their insurance information in exchange for cash.  While some of the beneficiaries will testify that they received a massage, had a cursory examination, or even spent a few hours in the sleep study room, the bulk of those beneficiaries will testify that they received no treatment, signed blank forms, were told not to date forms, and never came back to the clinic—yet their health insurance was billed for sleep studies, durable medical equipment related to sleep studies, physical therapy sessions, allergy testing and treatments.

### i.    Allergy Testing

The evidence at trial will show that Sleep Study contracted with a company called Allergy MD Services to conduct allergy tests and provide allergy treatment.  Allergy MD Services sent an employee—witness Mailen Diaz Hernandez—to the clinic to provide services.  The evidence at trial will show that although the clinic had the capacity to conduct allergy testing, Mailen Diaz Hernandez created fraudulent patient allergy test results and treatments by falsely completing allergy test and treatment forms for patients that never received the tests or treatment. In addition,

the testimony and evidence will show that immunotherapy was prescribed and billed for 99% of the patients who supposedly received an allergy test.  Indeed, Borges will testify that she personally wrote certain prescriptions for the immunotherapy and epi pens—and then Dr. Gonzalez signed those prescriptions and related paperwork despite never even meeting those patients.  The evidence will show that Leon also fabricated allergy testing forms.  Sleep Study submitted allergy treatment claims totaling $3,650,676.50, for all patients, across all Insurance Company Victims, and was paid $1,530,630.67. Sleep Study paid a total of $582,800.00, via check, to Allergy MD.

### ii.    Physical Therapy

The evidence at trial will show that Sleep Study purportedly provided physical therapy services to beneficiaries.  Indeed, the offer of physical therapy and massages was a draw for certain employee groups with physically demanding jobs such as airline baggage handlers and infrastructure-construction workers.  However, Sleep Study did not even employ a physical therapist.  Leon acted as a physical therapist, but according to the Florida Department of Health, Leon is a licensed massage therapist and a registered medical assistant, but does not have a physical therapist license.  The Insurance Company Victims and Florida Statute § 486.028 require a license to practice physical therapy.  Additionally, Florida Statute § 486.151, discusses prohibited acts subject to penalty.  Specifically, it states that it is unlawful for any person to practice physical therapy or attempt to practice physical therapy without an active license or temporary permit.  Moreover, it is unlawful to use the name or title "Physical Therapist" or any other name/title which would lead the public to believe that the person using the name or title is license to practice physical therapy.  And, Sleep Study routinely billed beneficiaries' insurance for physical therapy that was never performed.  For example, the clinic billed beneficiary L.N.C.'s insurance for 38 physical therapy sessions; L.N.C. will testify that he has never been to the clinic and never received any

physical therapy.  Beneficiary D.K. will testify that he went to the clinic once and never received treatment yet his insurance as billed by the clinic for 33 physical therapy sessions.

Sleep Study submitted claims for physical therapy totaling $30,209,953, for all patients, across all Insurance Company Victims, and was paid $4,442,737.

### iii.    Sleep Studies

The clinic also fraudulently billed for sleep studies and durable medical equipment related to sleep issues.  There will be significant testimony at trial that the Insurance Company Victims were billed for sleep related claims but never received the treatment or equipment, never met with a doctor to discuss sleep issues, and did not suffer from any sleep issues.  For example, beneficiary S.F. will testify that he went to Sleep Study once and received some therapy but nothing else and never went back; Sleep Study billed his insurance for a sleep study and durable medical equipment for sleeping.

Sleep Study submitted sleep study claims totaling $8,144,963.31, for all patients, across all Insurance Company Victims, and was paid $1,404,650.87.

## C.  LEGAL STANDARD
### 1.  Inextricably Intertwined Evidence

Evidence of prior bad acts is not extrinsic under Rule 404(b) if it:  (1) arose out of the same transaction as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably linked with the charged offense.  *United States v. Ellisor*, 522 F.3d 1255, 1269 (11th Cir. 2008).  It is axiomatic that "[e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. McClean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (quoting *United States v.*

*Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)); *see also United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (holding that "evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an 'integral and natural part of the witness's accounts of the circumstances surrounding the offenses to which the defendant was indicted.'" (quoting *United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989)).

 2.   **Federal Rule of Evidence 404(b)**

Courts in this Circuit apply a three-prong test to assess the admissibility of evidence under Rule 404(b):

> First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

 *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003).

The Eleventh Circuit has recognized that Rule 404(b) is "a rule of inclusion, and . . . accordingly '404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case.'" *Id.* (quoting *United States v. Perez-Tosta*, 36 F.3d 1552, 1562 (11th Cir. 1994)) (*accord United States v. Stephens*, 365 F.3d 967, 975 (11th Cir. 2004)). Rule 404(b) is a rule "of inclusion which allows [extrinsic] evidence unless it tends to only prove criminal propensity. The list provided by the rule is not exhaustive and the range OF relevancy outside the ban is almost infinite." *Stephens*, 365 F.3d at 975 (quoting *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989) (internal quotations omitted)).

"A defendant who enters a not guilty plea makes intent a material issue which imposes a

substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998). ("The relevance of other crimes evidence to intent is determined by comparing the defendant's state of mind in committing both the extrinsic and charged offenses."). Finally, as with any evidence, the probative value of proffered 404(b) evidence must not be *substantially outweighed* by unfair prejudice. *Jernigan*, 341 F.3d at 1282 (internal quotations omitted) (emphasis in original). "This determination lies within the sound discretion of the district judge and calls for a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Id.*

**D.      ARGUMENT**

**1)   The Court Should Admit Inextricably Intertwined Evidence that Defendant Blanca Gonzalez worked at other fraudulent clinics before and during the time period in which she worked at Sleep Study**

The United States anticipates that Borges will testify at trial that she hired Defendant Blanca Gonzalez to work as the medical director for Sleep Study at the suggestion of her husband's friend, Jesus Garces.  Defendant Beatriz Chavez, a recruiter for Sleep Study, will testify that her boyfriend Jesus Garces told her that he "got the doctor for [Sleep Study]."  The United States intends to call Jesus Garces at trial.  The United States indicted Garces in case number 19-cr-20812-ARS (S.D. Fl.) on charges of health care fraud and wire fraud, and conspiracy to commit those crimes.  Garces pled guilty and received a sentence of 150 months' imprisonment.  The United States anticipates that Garces will testify that he met Dr. Blanca Gonzalez through a friend, Enrique San Pedro.  Garces will testify that he owned a home health agency called Blue Hope Professional Care between 2005 and 2013 or 2014.  Between 2012 and 2013 or 14 he would bring

patients to Dr. Gonzalez's clinic for the purpose that she provide a prescription for that patient to use Garces' home health agency. He would pay Dr. Gonzalez $100 per patient and would bring eighty patients per month. Garces would pay Dr. Gonzalez in cash at her home in Miami Lakes over dinner with Dr. Gonzalez and her husband. Garces will testify that he recommended Dr. Gonzalez to Borges and Hernandez.

This evidence is inextricably intertwined to the charged conduct. The evidence is necessary to complete the story of the crime—how the clinic found a doctor that was willing to sign patient files and prescriptions for patients that she did not see, did not treat, and in some cases, never visited the clinic. *Ellisor*, 522 F.3d at 1269.

Garces will also testify that he hired Dr. Gonzalez to work at a clinic, Angel's Children Therapy, that he owned with his wife. Garces will testify that he saw how lucrative Sleep Study was and in 2016 set out to create his own version, using Dr. Gonzalez to sign patient forms and prescriptions without ever seeing patients or providing services. Garces will testify that he paid her $1,500 per month and that she would come to the clinic once a month to sign papers and forms related to physical therapy. He will also testify that sometime in 2017 or 2018 Dr. Gonzalez told him that he needed to pay her $3,000 per month because she knew how much he was making from the private insurance companies. When he refused, she refused to work for this clinic any longer. The United States is in the process of obtaining the financial records from Angel's Children Therapy to corroborate the payments, as well as to find Garces's wife, T.B., who owned and ran the clinic with Garces.

This evidence is inextricably intertwined to the charged crime because it arose out of the same transaction as the charged offense—Garces hired Dr. Gonzalez to work at Angel's Children Therapy because he saw what she did at Sleep Study. *Ellisor*, 522 F.3d 1255 at 1269. In addition

it is important to providing a complete picture of Dr. Gonzalez's behavior and activity—she regularly and as a matter of course sold her signature and NPI number for money.  She made her living by signing patient forms and files at various clinics and receiving payment for doing so.

But even if this evidence is not inextricably intertwined, it is still admissible pursuant to Rule 404(b) because the evidence clearly shows that Dr. Gonzalez's state of mind—that her robo-signing of patient files for patients she did not treat was not done by accident or mistake.  First, the evidence is relevant to an issue other than her character—the criminal activity at Angel Children's Therapy demonstrates that Dr. Gonzalez's actions at Sleep Study was not by accident or a mistake.  Dr. Gonzalez regularly signed patient forms and prescriptions without seeing patients and received payment for doing so.  Second, there is sufficient proof for the jury to find that the defendant committed the extrinsic act.  The United States will call Garces and the defense will have an opportunity to cross-examine him.  In addition to the testimony of Garces, the United States intends to call Garces' wife, T.B. and to introduce records of the payment.

Third, this evidence possesses probative value that is not substantially outweighed by its undue prejudice.  The evidence possesses probative value as to Dr. Gonzalez's mode of operating, and as corroboration for testimony and evidence that Dr. Gonzalez was not at Sleep Study every day.  In addition, it is not outweighed by its undue prejudice because it is limited in scope and is a very small part of the United States' presentation.  The United States will call between 40 and 50 witnesses to testify at trial; this evidence will be limited to the testimony of only two witnesses. *Jernigan*, 341 F.3d at 1280.

The United States intends to call Marya de La Paz as a witness at trial.  De La Paz owned Referral Medical Services, Inc.  De La Paz will testify that Dr. Gonzalez was paid a monthly salary of $2,000 and would come into Referral Medical Services, Inc. for four hours or less to sign

patients' files and prescriptions. Like Angel's Children Therapy this evidence is inextricably intertwined to the charged conduct: Dr. Gonzalez's manner of making her living was to sell her signature and NPI number in exchange for money. She performed an extremely limited role and signed forms and prescriptions without meeting with patients, yet received a salary. Again, even if this evidence is not inextricably intertwined, it is still admissible pursuant to Rule 404(b) because the evidence meets all four prongs of admissibility. First, the evidence is relevant to an issue other than her character—it demonstrates that her actions were not by accident or a mistake. Second, there is sufficient proof for the jury to find that the defendant committed the extrinsic act. The United States will call De La Paz and the defense will have an opportunity to cross-examine her. Third, this evidence possesses probative value that is not substantially outweighed by its undue prejudice. The evidence possesses probative value as to the Doctor's mode of operating, and as corroboration for testimony and evidence that the Doctor was not at Sleep Study every day. *Jernigan*, 341 F.3d at 1280.

Lastly, the United States intends to call Defendant Elier Padron Hernandez regarding his criminal activity at Sleep Study, which included being paid in exchange for bringing patients from his place of employment. The United States anticipates that he will testify that he saw Dr. Gonzalez at another clinic that billed beneficiaries' insurance for services not needed or rendered. Defendant Padron Hernandez is expected to testify that he would visit another clinic with fellow patient recruiter Jorge Luis Taboada, and would bring patients to this clinic in exchange for money.

2) **The Court Should Admit Inextricably Intertwined Evidence that Defendant Jay Joseph visited and took patients to other fraudulent clinics during the time period in which he recruited patients to Sleep Study**

In *United States v. Lisvet Alvarez Rodriguez*, 21-cr-20407-RKA, the United States indicted clinic owners, a doctor and patient recruiters in a similar scheme to the charged conspiracy here.

In that case, three clinics worked together by sharing patient information to bill Blue Cross Blue Shield for physical therapy that beneficiaries never received or was not medically necessary. Several of the witnesses in this case attended a clinic in that conspiracy as well (specifically, witnesses F.B., S.F., Y.M.D.O.T., C.A.P.C., and A.A.). Prior to indictment, Blue Cross Blue Shield conducted an analysis of "improbable hours" billed by the clinic during the same time that Sleep Study billed private insurers for services not received by beneficiaries. This memorandum has been turned over to counsel for the defendants. As part of the analysis, the Blue Cross Blue Shield investigator reviewed the top-5 dates of service, then reviewed the medical record documentation for each member and calculated the documented time for each patient and each therapeutic procedure. The investigator found that the clinic billed for an improbable amount of hours (18 hours on one day, 17 on another, etc.). Those improbable hours included billed services for Defendant Jay Joseph and three witnesses in this case (S.F., F.B. and Y.M.D.O.T. – the United States has provided the full names of these witnesses to counsel or the defendants).

The United States intends to call witnesses S.F. and F.B. to testify at trial and will seek testimony concerning Defendant Jay Joseph's involvement in recruiting these beneficiaries to additional clinics. The United States will call an agent from the Federal Bureau of Investigation to provide testimony regarding the clinics in case number 21-cr-20407-RKA and, if necessary, the United States will call the Blue Cross Blue Shield investigator to testify to the investigation, as well as to testify that no patient file was produced or provided for Defendant Jay Joseph, despite the clinic billing for services allegedly rendered.

Evidence of Defendant Jay Joseph paying beneficiaries during the same time he paid beneficiaries to provide their health insurance information to Sleep Study is inextricably intertwined to the charged case. *Ellisor*, 522 F.3d at 1269. Witness U.S. will testify that Defendant

Jay Joseph paid him $1,000 in cash to provide his health insurance information to Sleep Study, and that Joseph appeared to be in charge, and told U.S. that that's what he did, i.e. bring patients to the clinic in exchange for money.  Indeed, it is the same witnesses/beneficiaries that he is taking from clinic to clinic for purposes of payment, not medical necessity.  Evidence that Joseph brought patients to other clinics for money is evidence that this was a role he assumed during the relevant time period; as patient recruiter for co-workers from Archer Western.

The evidence is also appropriate as 404(b) because the evidence is not offered to show the defendant's character.  Rather it is to show that his actions were not an accident or mistake, and that this was his mode of operating.  The probative value of this evidence is not outweighed by prejudice; the Jury will have the opportunity to see and hear the witnesses testify and can make their own determinations as to credibility and weight after direct and cross-examinations.

**E.**     **CONCLUSION**

For the foregoing reasons, the United States of America respectfully submits that the Court

should admit the evidence described throughout as inextricably intertwined with the charged

conduct, or in the alternative as evidence appropriately admitted pursuant to Rule 404(b).

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By:     /s/ *Lindsey Lazopoulos Friedman*
Lindsey Lazopoulos Friedman
Florida Bar No. 91792
Stephanie L. Hauser
Florida Bar No. 92765
Assistant United States Attorney
Southern District of Florida
99 Northeast 4th Street, 4th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9168
Facsimile: (305) 536-4699
E-mail: Lindsey.Friedman@usdoj.gov
E-mail: Stephanie.Hauser@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 5, 2022, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF.

*/s/ Lindsey Lazopoulos Friedman*
Lindsey Lazopoulos Friedman
Assistant United States Attorney
